**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

GLOBAL CONSULTING USA LLC,　　　　)
*d/b/a Paragon Risk Engineering*,　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　　　　)　　　No. 2:24-cv-04919-DCN
　　　　　vs.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)　　　**ORDER**
PINNACLE RISK ENGINEERING, LLC;　　)
DUANE YOST; and TIFFANY HRYCYNA,　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　　　　)
_____)
　　　　　　　　　　　　　　　　　　　)
PINNACLE RISK ENGINEERING, LLC;　　)
DUANE YOST; and TIFFANY HRYCYNA,　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　Counter-Claimants,　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　vs.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
GLOBAL CONSULTING USA LLC,　　　　)
*d/b/a Paragon Risk Engineering*,　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　Counter-Defendant.　　　　)
_____)

This matter is before the court on plaintiff Global Consulting USA LLC's

("Paragon") motion for a preliminary injunction pursuant to Federal Rule of Civil

Procedure 65; the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq.; and

the South Carolina Trade Secrets Act ("SCTSA"), S.C. Code Ann. § 39-8-10, et seq.

ECF No. 8.  For the reasons set forth below, the court denies the motion.

## I.  BACKGROUND

This is a trade secrets case between an engineering and consulting company and

two of its former employees who left to form their own company.

1

Paragon is a company that provides engineering and consulting work for clients. ECF No. 1, Compl. ¶ 9. Defendants Duane Yost ("Yost") and Tiffany Hrycyna ("Hrycyna") were previously employed by Paragon, but this employment relationship ended on June 3, 2024. Id. ¶¶ 10, 11, 25. Paragon alleges that in May 2024, its operations manager, Eric Smolan ("Smolan"), received a customer inquiry related to one of Yost's projects. Id. ¶ 12. At the time, Yost was on PTO, and Smolan had permission to read Yost's emails. Id. Allegedly, Smolan opened Yost's emails and discovered an email to Yost containing a draft service contract for Yost to review between one of Paragon's clients ("Client A") and a company known as Pinnacle Risk Engineering, LLC ("Pinnacle") (collectively with Yost and Hrycyna, "defendants"). Id. Smolan allegedly contacted Yost, and Yost told Smolan that he, Hrycyna, and Nadine Binns ("Binns") were planning on starting Pinnacle as a new company to compete with Paragon. Id. ¶ 22. Shortly thereafter, Yost, Hrycyna, and Binns resigned their employment with Paragon. Id. ¶ 25.

After their resignation, Paragon allegedly discovered that Yost and Hrycyna had been using Paragon resources to form their new company and had been soliciting Paragon's clients. Id. ¶ 28. For instance, Paragon claims that Yost received an email to his Paragon email account on the day he resigned from another of Paragon's clients ("Client B") about setting up site visits with Pinnacle. Id. ¶ 32.

Moreover, Paragon further alleges that on May 31, June 2, and June 3, 2024—the days leading up to Yost's resignation—Yost downloaded proprietary and confidential Paragon technical guidance documentation, as well as propriety and confidential Paragon pricing and client site information developed by Paragon for Client B. Id. ¶¶ 35–36.

2

Paragon allegedly also discovered that on June 2, June 3, and June 4, 2024, Hrycyna similarly downloaded proprietary and confidential information related to Client B, as well as proprietary and confidential Paragon pricing and client information developed for other Paragon clients.  Id. ¶¶ 38–39.

Notably, Paragon asserts that, in its employee handbook (the "Handbook"), employees agree to not divulge or communicate any trade secrets or confidential information about Paragon's dealings with its clients to third parties.  Id. ¶¶ 42–43. Paragon also contends that the Handbook further prohibits any employee from undertaking any work that could prejudicially affect their ability to discharge their duties and responsibilities or which conflicts with Paragon's business.  Id. ¶ 44.  Paragon believes that Yost and Hrycyna violated these provisions by using the trade secrets and proprietary information they downloaded (collectively, the "Documents") in their new business to compete with Paragon.  Id. ¶ 49.

In contrast, Yost and Hrycyna contend in their declarations that they were unhappy at Paragon and sought to form their own business after Paragon encouraged them to form an "exit strategy."  ECF No. 20-1, Yost Decl. ¶¶ 8–12; ECF No. 20-2, Hrycyna Decl. ¶¶ 12–15.  Yost explains that, because he was one of only a few qualified risk engineers specializing in spirits and distillery occupancy, he was aware that one of Paragon's clients "would have sought [him] out wherever [he] was employed."  Yost Decl. ¶ 13.  Allegedly, this caused Yost, Hrycyna, and other Paragon employees to decide to leave and form Pinnacle.  Yost Decl. ¶¶ 12–13; Hrycyna Decl. ¶¶ 12–15.

Yost and Hrycyna explain that, during their final days of employment with Paragon, they downloaded various engineering reports to their Paragon-issued laptops to

complete various outstanding projects before resigning.  Yost Decl. ¶¶ 6, 19, 37; Hrycyna

Decl. ¶¶ 6, 18–19, 22.  Notably, Yost and Hrycyna claim in their declarations that they

never downloaded or transferred any of the Documents off of their Paragon-issued

laptops.  Yost Decl. ¶¶ 6–7, 37; Hrycyna Decl. ¶¶ 6–7, 22; see also Yost Decl. ¶ 24

(declaring that Yost returned his Paragon-issued laptop to Paragon on June 6, 2024); ECF

No. 30.[1]

Moreover, defendants contend that the Documents belong to Paragon's clients

and are not confidential, proprietary, or trade secrets.  Yost Decl. ¶ 3; Hrycyna Decl. ¶ 3.

Beyond that, even if the Documents did contain confidential information, Yost and

Hrycyna contend that Paragon did not take reasonable efforts to maintain the secrecy of

the Documents.  Yost and Hrycyna claim that they never signed any restrictive

covenants, non-competes, non-solicitation agreements, confidentiality agreements, non-

disclosure agreements, or non-circumvention agreements with Paragon.  Yost Decl. ¶ 4;

Hrycyna Decl. ¶ 4.  They also maintain that they never received the alleged employee

Handbook from Paragon.  Yost Decl. ¶¶ 23, 35; Hrycyna Decl. ¶¶ 17, 21.

Yost and Hrycyna assert that, around when they resigned their employment with

Paragon, Robert McMullen ("McMullen"), Paragon's CEO, requested that defendants

sign a consultant agreement with Paragon that would include restrictive covenants and

that McMullen threatened that Paragon would bring legal action against defendants if

they did not sign the agreement.  Yost Decl. ¶ 23; Hrycyna Decl. ¶ 17.  Yost alleges that,

after defendants declined to sign the agreement, McMullen repeatedly contacted various

---

[1] During the hearing on Paragon's motion, Paragon's counsel agreed that there is currently no evidence that either Yost or Hrycyna transferred Documents off of their Paragon-issued laptops.  See ECF No. 30.

Pinnacle clients to inform them that Paragon was investigating Yost for stealing

confidential information and of this lawsuit in an effort to convince these clients to not

work with Pinnacle.  Yost Decl. ¶¶ 23, 26–33.  Yost believes that this has been an attempt

to "blacklist [defendants] in the industry and/or starve [defendants] out of work."  Id.

¶ 26.

Paragon filed this lawsuit on September 9, 2024.  ECF No. 1, Compl.  It asserts

nine causes of action: (1) breach of contract (against Yost and Hrycyna); (2) violation of

the SCTSA (against all defendants); (3) tortious interference with contractual relations

(against all defendants); (4) conversion (against all defendants); (5) breach of duty of

loyalty (against Yost and Hrycyna); (6) civil conspiracy (against all defendants); (7)

violation of the DTSA (against all defendants); (8) violation of the South Carolina Unfair

Trade Practices Act ("SCUTPA"), S.C. Code Ann. § 39-5-10, et seq. (against all

defendants); and (9) unjust enrichment (against all defendants).  Compl. ¶¶ 53–123.  On

October 8, 2024, Paragon moved for a preliminary injunction to prevent defendants from

using Paragon's alleged trade secrets and to restrain defendants from soliciting or

accepting business from Paragon's clients about whom those trade secrets relate.[2]  ECF

---

[2] Specifically, Paragon seeks an order from this court:

> (1) Preliminarily enjoining and restraining Defendants, and all other
> persons or entities acting in active concert or participation with Defendants,
> from possessing, using copying, and/or disclosing any confidential
> information or trade secrets belonging the Paragon;

> (2) Preliminary [sic] enjoining and restraining Defendants, and all
> other persons or entities acting in active concert or participation with
> Defendants, until twelve (12) months from the date of the Court's Order,
> from either soliciting or accepting business from any of the Paragon clients
> about which Defendants misappropriated confidential information and trade
> secrets. [sic]

No. 8.  Defendants responded in opposition on November 4, 2024.  ECF No. 20.  On

November 8, 2024, defendants filed their amended answer, now their operative answer,

in which they assert three counterclaims against Paragon: (1) abuse of process; (2)

defamation; and (3) negligent supervision, training, and retention.  ECF No. 24,

Countercl. ¶¶ 91–115.  Paragon replied to defendants' response on the motion for a

preliminary injunction on November 19, 2024.  ECF No. 25.  The court held a hearing on

Paragon's motion on January 15, 2025.  ECF No. 30.  As such, the motion is now fully

briefed and ripe for the court's review.

## II.  STANDARD

Federal Rule of Civil Procedure 65 authorizes federal courts to issue temporary

restraining orders and preliminary injunctions.  "The purpose of a preliminary injunction

is merely to preserve the relative positions of the parties until a trial on the merits can be

held."  United States v. South Carolina, 840 F. Supp. 2d 898, 914 (D.S.C. 2011) (quoting

Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)), modified in part, 906 F. Supp. 2d

463 (D.S.C. 2012), aff'd, 720 F.3d 518 (4th Cir. 2013).  The party seeking a preliminary

injunction must make a "clear showing" that: (1) it is likely to succeed on the merits, (2)

---

(3) Directing that Defendants shall return to Paragon or destroy, and not retain any copies thereof, all files and materials that contain any confidential information belonging to Paragon that are within their possession, custody, and/or control; and

(4) Directing that Defendants shall provide Paragon's undersigned counsel with a Certification of Compliance signed under oath, including that (i) all Paragon confidential information has been returned to Paragon and no copies thereof have been retained; and (ii) all files and materials containing any such confidential information have been permanently deleted from any and all computers, electronic devices, and cloud accounts within their custody, possession, and/or control.

ECF No. 8 at 1–2.

it is likely to suffer irreparable harm, (3) the balance of hardships tips in its favor, and (4)

the injunction is in the public interest.  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7,

20, 22 (2008).  To succeed, the movant must satisfy all four of the Winter factors.  Real

Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346–47 (4th Cir.

2009), vacated and remanded, 559 U.S. 1089 (2010), reissued in relevant part by per

curiam published order, 607 F.3d 355 (4th Cir. 2010).  "A preliminary injunction is an

extraordinary remedy never awarded as of right."  Winter, 555 U.S. at 24.

### III.  DISCUSSION

In assessing Paragon's motion, the court must begin with determining whether

Paragon has made a clear showing that it is likely to succeed on the merits of its claims at

trial.  See Real Truth, 575 F.3d at 346–47; Stinnie v. Holcomb, 77 F.4th 200, 208 (4th

Cir. 2023) (en banc), cert. granted sub nom. Lackey v. Stinnie, 144 S. Ct. 1390 (2024).

The court will do so by first outlining what Paragon must prove to succeed on a claim

under the DTSA and the SCTSA.[3]  Because the court ultimately finds that Paragon has

failed demonstrate that it is likely to succeed on these claims, the court denies Paragon's

---

[3] Paragon focuses its argument on its DTSA and SCTSA claims in its initial
memorandum accompanying its motion.  See ECF No. 8-1 at 5–9.  In its reply
memorandum, Paragon also briefly argues that it is likely to succeed on the merits of its
tortious interference with contract claim.  ECF No. 25 at 7–8.  The court declines to
consider this argument because it was raised for the first time in reply.  See United States
v. Williams, 445 F.3d 724, 736 n.6 (4th Cir. 2006).  Even if Paragon had properly raised
this argument, it would still be unpersuasive because, even if there is evidence that
defendants solicited some of Paragon's clients, Paragon has pointed to no evidence
demonstrating that defendants intentionally caused those clients to breach any contractual
agreement with Paragon.  See ECF No. 25 at 7–8; Todd v. S.C. Farm Bureau Mut. Ins.
Co., 336 S.E.2d 472, 473 (S.C. 1985) (listing elements of intentional interference of
contract claim).

motion for a preliminary injunction and declines to consider the remaining Winter

factors.[4]

To establish a claim for misappropriation of trade secrets under either the SCTSA

or the DTSA, Paragon must ultimately prove the following elements: "(1) the existence

of a trade secret; (2) communicated in confidence by the plaintiff to the employee; (3)

disclosed by the employee in breach of that confidence; (4) acquired by the defendant

with knowledge of the breach of confidence; and (5) used by the defendant to the

_____

[4] In their response memorandum, defendants describe the standard for issuing preliminary injunctions that the Fourth Circuit applied in Sun Microsystems, Inc. v. Microsoft Corp. (In re Microsoft Corp. Antitrust Litigation), 333 F.3d 517, 525–26 (4th Cir. 2003). ECF No. 20 at 8–9. In Microsoft Corp., 333 F.3d at 526, the Fourth Circuit used the "balance-of-hardship test" that it had first articulated in Blackwelder Furniture Co. of Statesville v. Seilig Manufacturing Co., 550 F.2d 189 (4th Cir. 1977). Under that standard, the court must start by considering the likelihood of harm faced by the plaintiff if the injunction is not granted and the likelihood of harm faced by the defendant if the injunction is granted. Blackwelder, 550 F.2d at 195. "Emphasis on the balance of these first two factors results in a sliding scale that demands less of a showing of likelihood of success on the merits when the balance of hardships weighs strongly in favor of the plaintiff, and vice versa." Microsoft Corp., 333 F.3d at 526. Thus, defendants structure their response by focusing on the balance of hardships first and using that analysis to inform their reasoning on the burden faced by Paragon in showing a likelihood of success on the merits. See ECF No. 20 at 8–9, 22–23.

However, the Fourth Circuit determined in Real Truth that the Supreme Court's decision in Winter required abandoning the balance-of-hardship test from Blackwelder. Real Truth, 572 F.3d at 346–47 ("The Winter requirement that the plaintiff clearly demonstrate that it will likely succeed on the merits is far stricter than the Blackwelder requirement that the plaintiff demonstrate only a grave or serious question for litigation. . . . Moreover, Blackwelder allows that upon a strong showing on the probability of success, the moving party may demonstrate only a possibility of irreparable injury—a standard explicitly rejected in Winter." (citations omitted)). Thus, after Winter and Real Truth, a plaintiff will only be entitled to a preliminary injunction if he first makes a clear showing of likelihood of success on the merits, and his burden in making this showing is not impacted by the balance of harm. See Real Truth, 575 F.3d at 346–47; Winter, 555 U.S. at 22; accord Stinnie, 77 F.4th at 208 ("Today, a plaintiff seeking preliminary relief must first make a 'clear showing' that his claim is likely to succeed on the merits." (quoting Winter, 555 U.S. at 22)); see also Starbucks Corp. v. McKinney, 602 U.S. 339, 346 (2024). Because Paragon has failed to make this showing, the court's analysis starts and ends with the first Winter factor.

detriment of the plaintiff." Prysmian Cables & Sys. USA, LLC v. Szymanski, 573 F.

Supp. 3d 1021, 1037 (D.S.C. 2021) (quoting Nucor Corp. v. Bell, 482 F. Supp. 2d 714,

725 (D.S.C. 2007)); see also SmartLinx Sols., LLC v. Zeif, 2022 WL 939846, at *6 n.2

(D.S.C. Mar. 29, 2022) ("The elements under the SCTSA and DTSA are substantially the

same, and the respective claims . . . are analyzed together."). Notably, Paragon does not

need to show actual misappropriation of a trade secret to be entitled to injunctive relief.

See Prysmian Cables, 573 F. Supp. 3d at 1041–42. Rather, Paragon may succeed in

securing its preliminary injunction, under either the SCTSA or the DTSA, if it can show

either actual or threatened misappropriation of a trade secret. See id.

Of course, before Paragon can show that defendants misappropriated a trade

secret, or threatened to do so, it must first establish the existence of a trade secret. See id.

at 1037. In general, a trade secret is information that

> (i) derives independent economic value, actual or potential, from not being
> generally known to, and not being readily ascertainable by proper means by
> the public or any other person who can obtain economic value from its
> disclosure or use, and

> (ii) is the subject of efforts that are reasonable under the circumstances to
> maintain its secrecy.

S.C. Code Ann. § 39-8-20(5)(a); accord 18 U.S.C. § 1839(3).[5] Assessing whether

Paragon made reasonable efforts to maintain secrecy requires the court to consider the

"totality of the evidence." See Lowndes Prods., Inc. v. Brower, 191 S.E.2d 761, 766

(S.C. 1972). "[O]ne who claims that he has a trade secret must exercise eternal vigilance.

---

[5] The trade secret definition quoted above is from the SCTSA and is virtually identical to the analogous definition found in the DTSA. Compare S.C. Code Ann. § 39-8-20(5)(a), with 18 U.S.C. § 1839(3). See also Prysmian Cables, 573 F. Supp. 3d at 1037. To the extent the SCTSA's and DTSA's respective definitions differ, those differences are not relevant to this case.

This calls for constant warnings to all persons to whom the trade secret has become

known and obtaining from each an agreement, preferably in writing, acknowledging its

secrecy and promising to respect it." Id. (quoting J.T. Healy & Son, Inc. v. James A.

Murphy & Son, Inc., 260 N.E.2d 723, 730–31 (Mass. 1970)).  Moreover, Paragon must

"specifically identify the trade secrets at issue.  Parties cannot extend this concept to

reach 'virtually all of the information [the former employee] acquired during his

employment.'" Prysmian Cables, 573 F. Supp. 3d at 1037 (alteration in original)

(citation omitted) (quoting Carolina Chem. Equip. Co. v. Muckenfuss, 471 S.E.2d 721,

724–25 (S.C. Ct. App. 1996)).

Paragon argues that the Documents Yost and Hrycyna downloaded during their

final days of employment with Paragon constitute trade secrets.  See ECF No. 8-1 at 7–8.

Paragon characterizes these Documents as containing, "among other things, multiple files

with: (i) customer-specific bid proposals; (ii) pricing information for work to be

performed; (iii) information related to customer specifications and need; and (iv)

information related to bids that Paragon was in the process of submitting for

transactions." ECF No. 8-1 at 7 (citing Compl. ¶¶ 34–39).  The court has reviewed these

Documents in camera and assumes, without deciding, that they contain the type of

information that courts usually protect as trade secrets—in other words, the court

assumes that the information in these Documents "derives independent economic value,

actual or potential, from not being generally known to, and not being readily

ascertainable by proper means by the public or any other person who can obtain

economic value from its disclosure or use."  See S.C. Code Ann. § 39-8-20(5)(a)(i); see

also Prysmian Cables, 573 F. Supp. 3d at 1042 ("[I]nformation regarding [the plaintiff's]

10

finances, prices, margins, customer contracts, products strengths and weaknesses, product

strategies, business plans, project estimates, costs, pricing, customer lists, technology,

and technical data is all undisputedly confidential.").

Nevertheless, Paragon has not clearly shown that it has taken reasonable efforts to

maintain the secrecy of the information in these Documents.  In its initial memorandum

in support of its motion, Paragon makes reference to its efforts to maintain the secrecy of

this information in only one sentence, and the only evidence Paragon cites is its verified

complaint.  See ECF No. 8-1 at 8 (citing Compl. ¶¶ 40–44).  However, Paragon's

complaint does not provide meaningful detail on the measures it took to maintain the

secrecy of its Documents.  See Compl. ¶¶ 40–44, 98.  Instead, the complaint's references

to Paragon's security measures are vague, if not conclusory:

> 40. Paragon takes reasonable precautions to protect the secrecy of
> many, if not all, of the documents set forth in paragraph 34–39, including,
> without limitation, restricting access to such information, internally
> designating such information as confidential when necessary, informing
> employees of the confidentiality of certain information, and requiring
> employee to abide by confidentiality obligations.

> 41. Many, if not all, of the documents set forth in paragraph 34–39
> are Paragon's trade secrets because they are not readily ascertainable by
> proper means by those outside of Paragon and they provide Paragon with
> present and future independent economic value.

> 42. In Paragon's employee handbook, employees agree that they
> shall not, both during or after the termination of employment, divulge,
> communicate to any third party without permission, or make use for
> themselves or others any trade secrets and confidential information
> concerning Paragon, or any dealings, transactions or other information
> relating to Paragon or any customer for which an employee has come to
> know, received, or obtained information about by reason of their
> employment.

> 43. Confidential information includes the name and address of
> Paragon's customers and suppliers and details of Paragon's special
> processes.

44. The employee handbook also provides that during the period of employment, an employee may not undertake any work or other activity which may prejudicially affect their ability to discharge their duties and responsibilities or which conflicts with Paragon's business.

 . . . .

98. Paragon took reasonable steps to protect these trade secrets including, without limitation, an employee confidentiality policy for all employees.

Id.

In its reply memorandum, Paragon cites to a declaration supplied by McMullen in which McMullen provides a further description of Paragon's secrecy measures and employee Handbook.[6]  See ECF No. 25-1, McMullen Decl.  However, this evidence is similarly insufficient.  McMullen describes how Paragon issued Yost and Hrycyna laptops, which they were to only use for their Paragon work.  McMullen Decl. ¶ 5.  He testifies that employees are required to create laptop-specific passwords and change those passwords regularly and that Paragon "has the ability to limit access to certain drives and workspaces on a 'need to know' basis, meaning that only employees handling a particular client matter are given access to files for that client or matter."  Id. ¶¶ 6–8 (emphasis added).  Notably, however, McMullen does not testify that Paragon ever actually did restrict Yost or Hrycyna from accessing the Documents in this manner.  See id.; see also id. ¶¶ 9–10 (asserting that many of the Documents that Yost and Hrycyna downloaded were not related to the work Yost and Hrycyna were currently completing for Paragon).

Beyond that, McMullen's description of the employee Handbook suggests that it is not a reasonable secrecy measure.  Notably, both Yost and Hrycyna testified in their

---

[6] Paragon also cites to a declaration supplied by Smolan in a different section of its reply memorandum, but Smolan's declaration does not include information on Paragon's secrecy measures.  See generally ECF No. 25-2, Smolan Decl.

own declarations that they never received a copy of this Handbook, Yost Decl. ¶ 23;

Hrycyna Decl. ¶ 17, and McMullen does not directly refute this assertion, see McMullen

Decl. ¶¶ 11–12.  Instead, McMullen simply explains that, during orientation, "all

employees are informed that Paragon has an Employee Handbook that can be found on

Paragon's SharePoint site."  McMullen Decl. ¶ 11.  He does state that he personally

emailed Yost a copy of a handbook with similar confidentiality provisions but that that

handbook was only applicable prior to Paragon being bought-out by a different

company.[7]  McMullen Decl. ¶ 12.  Moreover, the Handbook has no place for an

employee signature, so there is no evidence that Yost or Hrycyna ever signed it or any

other document containing a secrecy policy or a non-disclosure agreement.  See ECF No.

20-20.

Finally, even if there were evidence showing that Yost or Hrycyna received the

Handbook, McMullen's testimony suggests that Paragon was not vigilant in enforcing the

Handbook or reminding its employees of the confidentiality provisions contained therein.

Instead of Paragon specifically pointing out the confidentiality section, McMullen merely

testifies that Paragon tells employees where they can find the Handbook, and he states

that this Handbook "contains a confidentiality policy . . . which protects Paragon's

confidential information and trade secrets, including information about Paragon's

clients."  McMullen Decl. ¶ 11.  These isolated steps are insufficient efforts for Paragon

---

[7] McMullen testifies that, because Yost began his employment with Paragon before Paragon was purchased by another company, Sigma 7, he sent Yost a copy of Paragon's then-existent handbook, which contained a similar confidentiality provision, on December 21, 2011.  McMullen Decl. ¶ 12; see also ECF No. 25-1 at 30–31, McMullen Decl., Ex. D (confidentiality provision in older handbook).  However, McMullen does not testify that he ever sent a copy of Paragon's current Handbook to Yost, nor does he testify that he ever sent a copy of either handbook to Hrycyna.

to maintain its secrecy.  See Lowndes, 191 S.E.2d at 765–66 (finding that an employer did not take reasonable efforts to maintain secrecy when it did not require employees to sign confidentiality or secrecy agreements and "[e]mployees were rearly [sic], if ever, admonished concerning the 'secrecy' of the [employer's] processes or equipment, not even upon [the] employee's termination").  Therefore, the Handbook falls well short of a reasonable secrecy measure.[8]

Because Paragon has failed to make a clear showing that it took reasonable efforts to maintain the secrecy of the Documents, it has not shown that these Documents merit protection as trade secrets.  See S.C. Code Ann. § 39-8-20(5)(a); 18 U.S.C. § 1839(3).  Consequently, it has failed to make a clear showing that it is likely to succeed on the merits of its claims under the DTSA or SCTSA, and its motion for a preliminary injunction is denied accordingly.  See Real Truth, 575 F.3d at 346–47; Stinnie, 77 F.4th at 208.

---

[8] Additionally, Yost and Hrycyna also testify that their understanding is that this Handbook was only applicable for employees in Paragon's European division, which is headed by Jon Woodman ("Woodman").  Yost Decl. ¶ 23 n.2; Hrycyna ¶ 17 n.2.  McMullen refutes this assertion and testifies that the Handbook applies to all of Paragon's employees in both the United States and in the United Kingdom.  McMullen Decl. ¶ 11.  The court makes no finding on whether the Handbook is limited to Paragon's European operations, but the court notes that the Handbook contains several references to Woodman and United Kingdom law.  See generally ECF No. 20-20.

## IV.   CONCLUSION

For the reasons set forth above, the court **DENIES** Paragon's motion for a

preliminary injunction.

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**January 29, 2025**
**Charleston, South Carolina**